INSURANCE CO. v. RAILROAD.

(Filed April 4, 1905.)

*Railroads—Fires—Evidence—Train    Sheets—Instructions.*

1. A record containing the entries made in the usual course of business on the train sheets by witness (a train dispatcher) from reports telegraphed to him by station agents as to the arrival and departure of trains, is admissible for the purpose of showing the position of a train at a certain time.

2. In an action against the defendant for burning cotton, an instruction that if the fire originated from sparks from an engine on the defendant railroad, the presumption was that the sparks were negligently emitted, and if the defendant had failed to rebut such presumption, the jury should find the cotton was burned by defendant's negligence, correctly presented the law governing defendant's liability.

ACTION by the Firemen's Insurance Company and others against the Seaboard Air Line Railway heard by *Judge B. F. Long,* and a jury, at the October Term 1904, of the Superior Court of WAKE County.

Plaintiffs alleged that on the 19th day of October, 1902 certain cotton, upon which plaintiff companies had issued policies of insurance, was burned by the negligence of the defendant's agents and servants. That by reason of the destruction of said cotton, plaintiffs were compelled to pay the value thereof; that the owners of said cotton transferred and assigned to the plaintiffs all rights of action which they had against the defendant company for the negligent burning thereof. Defendants denied the material allegations in the complaint. The parties went to trial upon the following issues:

"1. Was the property of the Hamlet Ice Company insured by the plaintiffs as alleged in the complaint at the time it was burned? Answer: Yes."

"2. Was the said property burned by the negligence of the defendant company, as alleged in the complaint? Answer: No."

From a judgment upon the verdict the plaintiffs appealed.

*Busbee & Busbee* and *Douglass & Simms* for the plaintiffs.
*Day & Bell* and *T. B. Womack* for the defendant.

CONNOR, J., after stating the facts: In the trial of this cause it became material to show at what time the defendant's wrecking train No. 371 reached Hamlet, the station on defendant's road, at which the cotton was burned. Defendant introduced one C. Lane, who testified that he was employed by the defendant road as train dispatcher on 19 October, 1902; that it was his duty to keep a record of the arrival and departure of all trains at all telegraph stations; that the record was made and kept on the train sheet; at the

time trains arrived at and left stations, the operator at such stations notified the dispatcher, who immediately recorded on the sheet the time as it was reported to him; that such sheet constituted a record of the arrival and departure of all trains. That he governed the movements of trains by such record; that on the 19th of October 1902, the official report was sent him and that he immediately recorded thereon the time of the arrival of the extra train, which was the wrecking train at Hamlet of that date, and that he had the record before him. The defendant then offered the record in evidence for the purpose of showing the time of the arrival of the wrecking train at Hamlet, which witness McDonald testified was taken charge of by shifting engine 371 on its arrival. Objection. The court ruled that the witness could refresh his recollection by an inspection of the record enabling him to speak touching his own acts at the time with regard to the matter under inquiry, but at that time ruled out the declaration which any other agent of the company made to him at the time by wire or otherwise. The witness stated that he could not state of his own personal knowledge the time at which the wrecking train arrived at Hamlet. The court admitted the record in evidence, showing the entries made by witness of statements made to him by wire from the agent of the defendant at Hamlet as to arrival and departure of said wrecking train, to which plaintiff duly excepted. Defendant also introduced one J. W. Hunt, who testified that he was employed by defendant company as conductor and that as such he ran wrecking train on October 19, 1902 from Raleigh to Hamlet; that it arrived at Hamlet at 12:37. Witness is then shown a book which he identifies as a register showing the time of arrival, which he says is kept at Hamlet; that it was his duty to register the arrival of the train and that he did register it on that day. He identifies the entry in his own hand writing. "Extra train. Time arrival, 12:37 p. m." Signed by him

and also by engineman. This last record was offered by defendant in corroboration of witness Hunt and the court admitted it for that purpose, so instructing the jury.

It is contended by the plaintiffs that the "train sheets" are not admissible because, while containing entries, made by the train dispatcher in the usual course of business, he had no personal knowledge of the truth of the statements recorded; that he simply recorded information derived from the operator at Hamlet, a hundred miles or more distant from Raleigh. This, they say, is but hearsay.. The defendant, on the other hand, contends that the entry made by the train dispatcher, although based upon information derived from the operator, by reason of the circumstances under and the manner in which the information was communicated, is surrounded by all possible safeguards against error, uncertainty or falsehood—and therefore comes within the exception to the general rule excluding hearsay evidence. The question is of first impression in this State. We have given it careful and anxious consideration, desiring to make no departure from the well settled principles of the law of evidence, or the decisions of this Court, at the same time recognizing, and keeping in view, the duty of the Court to make diligent effort to find in those general principles such safe and reasonable adaptibility that in the changing conditions of social, commercial and industrial life there may be no wide divergence in the decisions from the standards by which men are guided and controlled in important, practical affairs. ' The law of evidence, based upon certain more or less well defined general rules, evolved from experience, has been molded by judicial decision and legislative enactment into a system having for its end and purpose, and believed to be adapted to, the discovery of truth in judicial proceedings. Mr. Greenleaf says, "In the ordinary affairs of life we do not require demonstrative evidence, because it is not consistent with the nature of the subject, and to insist upon

it would be unreasonable and absurd. The most that can be affirmed of such things is that there is no reasonable doubt concerning them." Prof. Thayer says, "The law of evidence is the creature of experience rather than logic."

"The distinctions of the law are founded on experience not on logic. It therefore does not make the dealings of men dependent upon mathematical certainty." Holmes Com. Law 156. "It is no doubt true that to a very great extent the law of procedure, as well as the primary law, is founded, not on the experience of isolated persons, but the general experience of men engaged in the business and vocation of life." 1 Elliott, Sec. 3.

The Courts early adopted and have at all times rigidly adhered to the rule that witnesses, in testifying, must be confined to that which is within their personal knowledge and that which is but hearsay must be excluded. 1 Greenleaf (16 Ed.) 98; 1 Elliott on Ev. 215. The wisdom of this general rule, and the reason upon which it is founded are obvious and require no vindication or discussion. The Courts however soon found from experience that unless exceptions were made to the general rule, it would be impossible, in many cases, to establish the truth; that legal rights would be sacrificed and wrongs be without remedy. Judge Elliott says, "As already stated, it was conceived originally that witnesses should always be present, but this was found impracticable. In consequence the general rule has become honey-combed with so-called exceptions. The grounds of making these exceptions differ as do the different exceptions. The ground as to some is that the hearsay is rendered necessary by the difficulty of other proof; as to others, the ground is that owing to the circumstances under which certain declarations were made, some guarantee of their reliability is furnished other than the mere fact of their having been made, that is, the circumstances add peculiar weight to this evidence and dispense with the ordinary tests of credi-

bility." 1 Elliott, 320. The general and well recognized exceptions are stated in Elliott on Ev. 331; 1 Greenleaf 114. Prof. Wigmore says that the reasons upon which the exceptions are based are "Circumstantial guarantee of trustworthiness and necessity." 11 Wigmore Ev. Sec. 1420. The principle with its limitations is well stated by *Jessell, M. R.* in *Sugden v. St. Leonards* L. R. 1 Pro. Div. (1875-6) 154, (241.) He says: "Now I take it the principle which underlies all these exceptions is the same. In the first place the case must be one in which it is difficult to obtain other evidence, for no doubt the ground for admitting the exception was that very difficulty. In the next place the declarant must be disinterested, that is, disinterested in the sense that the declaration was not made in favor of his interest. And thirdly the declaration must be made before dispute or litigation, so that it was made without bias on account of the existence of a dispute or litigation which the declarant might be disposed to favor. Lastly, and this appears to me one of the strongest reasons for admitting it, the declarant must have had peculiar means of knowledge, not possessed in ordinary cases." Among the exceptions to the general rule we find "Entries and declarations of third parties made in the regular course of duties or business." Such entries are of two kinds. 1st. Those made by the entrant respecting a transaction, conducted by, or matter known to him personally in which no other person has taken any part. 2nd. Those made by the entrant upon information communicated to him by some other person acting in the line of his duty to make report to him. The entries made by the train dispatcher fall within this class. It is undoubtedly the general rule that if the entrant and the person making the report upon which the entry is made are both living and available, they should be produced to testify to the truth of the subject matter of the entry. That if one be living and available and the other dead or unavailable,

that is, insane or beyond the process of the Court, the entry may be introduced upon the testimony, as to its authenticity of the living, available person. Can the entry be admitted when, as in the case before us, the entrant is living and the person upon whose report the entry is made is not produced, nor his absence accounted for? Mr. Greenleaf referring to the decisions of the Courts in respect to the admissibility of this class says: "Other Courts    *    *    *    admit them (the entries) without accounting for the original observer, on the sound consideration that it is practically impossible in mercantile conditions to trace and procure every one of the many individuals who reported the transactions." 1 Greenleaf 120 (a). He says that other Courts refuse to permit such entries to be introduced. Judge Elliott, quoting the language of Mr. Greenleaf, says: "We are inclined also to agree, in the main, with the writer quoted in the last preceding section, but not entirely without qualification. It may be—although as shown by the authorities there cited, there is sharp conflict among the authorities—that such entries are admissible, in a proper case, when duly authenticated, on proof that the informant knew the facts or properly reported them, even though he is not put upon the stand, especially if he is unavailable, and there are authorities looking very decidedly in that direction in addition to those referred to in the preceding section." Citing *Meyor v. Brown,* 130 Mich., 449; *Bank v. Bank,* 108 Tenn., 374; *Donovan v. R. R.* 158 Mass., 450. *Prof. Wigmore* after a very interesting discussion of the question in its several aspects says: "The conclusion then is, that when an entry is made by one person in the regular course of busines, recording an oral or written report made to him by one or more persons in the regular course of business of a transaction lying in the personal knowledge of the latter, there is no objection to receiving that entry,    *    *    *    provided, the practical inconvenience of producing on the stand the numerous persons

thus concerned, would in the particular case outweigh the probable utility of doing so. Why should not this conclusion be accepted by the Courts? Such entries are dealt with in that way, in the most important undertakings of mercantile and industrial life. They are the ultimate basis of calculation investment and general confidence in every business enterprise; nor does the practical impossibility of obtaining constantly and permanently the verification of every employer affect the trust that is given to such books. It would seem that expedients which the whole business world recognize as safe could be sanctioned and not discredited by courts of justice. When it is a mere qeustion of whether provisional confidence can be placed in a certain class of statements there can not profitably and sensibly be one rule for the business world and another for the court room. The merchant and the manufacturer must not be turned away remediless because methods in which the entire community places a just confidence are a little difficult to reconcile with technical judicial scruples on the part of the same persons, who as attorneys have already employed and relied upon the same methods. In short, Courts must here cease to be pedantic and endeavor to be practical." We have made these extracts from the works of three standard American authors on the law of evidence to show the trend of thought and opinion upon the admissibility of entries falling within the class under discussion. An examination of the decided cases discovers a conflict of authority. In *Fielder v. Collier,* 13 Ga., 495 the action was assumpsit for balance due on account. The defendant shipped to plaintiff for sale as commission merchants cotton upon which they obtained advancements. The cotton when sold brought less than the amount advanced. The action was brought for the difference. For the purpose of showing the items making up the account, including expenses of selling etc., the plaintiffs offered to show a transcript from their books (this under the

rule of practice in that State was admissible if at all as the original.) The testimony was upon objection excluded. Upon appeal, *Lumpkin, J.,* said: "Shall this proof be received, or shall the plaintiffs be compelled to go behind the books thus verified by the clerks who kept them, and resort to each of the sub agents who participated in the transaction and sale of this produce. Are not the entries thus made in the usual course of business of this extensive trading establishment, and as a part of the proper employment of the witnesses who prove them not only the best but the only reliable evidence which it is practicable to procure? * * * They report to the clerks who keep the books of the concern and their functions are performed. It is not reasonable to suppose that they can remember the multitude of transactions thus occuring every day. After the lapse of a very brief period, the clerks themselves could only call to mind what had been done by referring to their entries and memoranda." The exact question is presented and decided in *Donovan v. R. R.* 158 Mass., 450. The defendant offered for the purpose of showing the position of a train at a certain time, the train sheets kept by the dispatcher with the testimony of the person who made them. The facts are singularly like those before us in respect to the manner in which the entries were made. This may be explained by the fact that all railroads necessarily have some approved system of controlling the movement of trains and keeping a record thereof—using the telegraph offices on their line of road as the medium for communication. It would be impossible without the most disastrous results to do otherwise. *Barker, J.* says: "The failure to produce the East Summerville operator is relied upon by the plaintiff as one ground for his contention that the entries were not shown to be competent evidence." He proceeds to note cases holding inadmissible certain shop book entries and says: "But no entries were transferred to the dispatcher's sheet from the sheet kept at the East

Summerville Station.   As telegraphic messages are read by
sound, as well as automatically recorded in symbols, these
entries stand upon the same footing as if made from oral
statements uttered at the indicated station and audible in
the dispatcher's office."   The reasoning of the learned Judge
is so satisfactory to our minds that we quote his language.
"It is clear that the sheet was worse than useless if its state-
ments, as seen by the dispatcher, were not accurate.   Every
interest of the defendant demanded that an entry when made
should be true and no reason can be conceived why the de-
fendant should procure or permit a false or incorrect entry
to be placed under the eye of the official who controlled the
movement of its trains; nor is there any reason to presume
that the operator who observed the passing of the train at
the station and telegraphed the information to the dispatch-
er's office, or the person who there received the messages and
made the entries on the sheet had any interest to mistake the
facts or to make false entries.   The system was the establish-
ed course of the defendant's business so that the sheet was
not an accidental memorandum, and every step by which
the information spread upon it was gathered, transmitted
and entered, was an act performed by some person in the
line of his duty and in the usual course of his employment
under a sanction tending to make his statements true and
these acts were so connected with and dependent upon each
other as to form parts of one transaction."   The case most
strongly relied upon by the plaintiffs sustaining their excep-
tion is *R. R. Co. v. Noel,* 77 Ind., 110 (121.)   The charac-
ter of the entries do not very clearly appear.   The court
cites no authorities and disposes of the question quite sum-
marily.   It is simply stated that the defendant offered as
evidence "the entries in books."   It does not appear how
they were authenticated, by whom or upon what basis
they were made.   The case is noticed by the Massachusetts
Court as being "Entries possibly similar."   The decision is

not very satisfactory as an authority, because of the meagre statement of the facts. Many of the cases cited by the plaintiffs are based upon construction of the "book debt laws" of the States. Some of them do not come within any of the exceptions to the general rule. We find no case directly in point, or giving us much aid in our Reports. In *Fairly v. Smith,* 87 N. C., 367 it was held that market reports published in newspapers when the information was gathered from reliable sources were admissible.

The record made by one appointed for that purpose by the signal service bureau of the state of the weather held admissible. *Knott v. R. R.,* 98 N. C., 73. *Prof. Wigmore* suggests that when an entry is made in the usual course of business based upon reports made by one whose duty it is to make such report, but who is not required to make and keep any record of the transaction, the entry so made is admissible upon the ground of necessity growing out of the fact that it is not to be expected that the person making such report would remember the fact reported—and that he is therefore unavailable in a legal sense. It is not to be expected that an operator, who reports to the dispatcher the time of arrival and departure of a number of trains daily could undertake to testify from memory the hour and minute of each arrival or departure. He has no duty imposed upon him to do so. If he did undertake to testify, as in this case, three years after the event, but little credence would be attached to his testimony. For practical purposes he is as essentially unavailable as if dead or insane. We are of the opinion that applying either test, trustworthiness or necessity the entries made on the train sheets were admissible. It has occurred to our minds that possibly the train sheet is admissible as a *quasi* public record. It is true that neither of the persons making it are sworn officers, yet it is well settled and now recognized by all courts that common carriers in the operation of their trains are discharging a public duty

with many of the incidents attaching to public agencies. It would seem not unreasonable that courts should give to their records, made in the discharge of such duty, and meeting the other requirements of public records the same recognition as is given to such records. It is not easy to see why this entry is not surrounded by the same "circumstantial guarantee of trustworthiness" as an entry made under similar conditions by a clerk in a public office. We do no more than suggest this view. The exception must be overruled. We deem it proper to say that in nothing said herein do we wish to be understood as opening the door to other testimony than that permitted by the statutes in force in this State in regard to book debts. Code Sec. 591, 2, 3; Acts 1897 Ch. 480. The plaintiffs requested His Honor to charge the jury: "That if the jury shall find from the evidence that the fire originated from sparks from an engine of the defendant railroad company, the presumption is that the sparks were negligently emitted (and such presumption arises whether the fire started on the outside or inside of the compress building.)" This was declined. His Honor at the request of the plaintiffs charged the jury: "That if the jury shall find from the evidence that the fire originated from sparks from an engine on the defendant railroad company, the presumption is that the sparks were negligently emitted; and if the jury shall further find that the defendant railroad company has failed to rebut such presumption, the jury should answer the second issue 'Yes.' "

We find no error in the refusal of the Court below to give the third special instruction, and think that the fourth instruction given presented to the jury the law governing the defendant's liability, if they found that the defendant company burned the cotton. We have examined the entire record with care. His Honor's charge is clear, full and correct. It would seem that the real question, around which

the controversy was fought out and decided, was whether the cotton was set fire to and burned by the defendant's engine. The judgment must be affirmed.

Affirmed.