## 11144

### CURRIE v. DAVIS, AGENT, ETC.

#### (126 S. E., 119)

1. CARRIERS—MEASURE OF DAMAGES FOR DELAY IN STARTING GINNERIES STATED.—Where plaintiff was delayed four days in starting two ginneries because railroad employee barred him from train, the measure of damages, if ginneries were established plants was rental value, but, if ginneries were not going concerns, was the interest on the money invested, and the wages of the laborers employed, reduced by earnings which plaintiff either received, or by reasonable diligence could have received, from employment of laborers in other work, and not the gross earnings or profits per day after start of operations.

2. EVIDENCE—OFFICIAL TRAIN DISPATCHER'S TESTIMONY AND TRAIN SHEETS AS TO TIME WHEN TRAIN ARRIVED AT CERTAIN POINT HELD NOT HEARSAY.—Testimony of official train dispatcher and his train sheets, which were original records made by him in ordinary course of business, based on telegraphic reports transmitted to him from various stations by agents, whose duty it was personally to observe the facts and transmit the reports as to time of arrival of train at certain point, held not hearsay.

3. EVIDENCE—IT IS MATTER OF COMMON KNOWLEDGE THAT MOVEMENT OF TRAINS DEPENDS ON ORDERS OF TRAIN DISPATCHER.—It is a matter of common knowledge that movement of all trains upon a line, a division, or a system, depends on orders of train dispatcher.

4. APPEAL AND ERROR—EXCLUSION OF EVIDENCE AS TO TIME WHEN TRAIN ARRIVED AT CERTAIN POINT IN ACTION INVOLVING RESULT OF

NOTE: On measure of damages for breach of contract preventing operation of industrial business in contemplation, but not established or in actual operation, see note in 19 L. R. A. (N. S.), 155.

On liability of carrier for mental suffering of passenger from mere verbal abuse unaccompanied by other breach of duty, see notes in 13 L. R. A. (N. S.), 159; 33 L. R. A. (N. S.), 386; L. R. A., 1918A, 600.

DELAY HELD PREJUDICIAL ERROR.—In action by passenger who missed train because gatekeeper refused him passage through gateway, involving issue as to result of delay, exclusion of official train dispatcher's evidence and train sheets kept by him offered to show time when train arrived at certain point *held* prejudicial error.

5. CARRIERS—PASSENGER SUING AGENT APPOINTED BY PRESIDENT COULD RECOVER COMPENSATORY DAMAGES FOR INJURIES TO FEELINGS AND HUMILIATION.— Passenger suing agent appointed by president under Transportation Act 1920, § 206 (U. S. Comp. St. Ann. Supp., 1923, § 10071¼cc), for refusal of gatekeeper to permit him to pass through gate to train, accompanied by violence and insulting and threatening language, could recover compensatory damages for injuries to feelings, humiliation, and mental sufferings.

6. CARRIERS—ALLOWANCE OF $8,660 AS COMPENSATORY DAMAGES FOR INJURIES TO FEELINGS, HUMILIATION, AND MENTAL SUFFERING HELD NOT EXCESSIVE.—Allowance of $8,660 as compensatory damages for injuries to feelings, humiliation, and mental suffering of passenger who was denied passage through gate to train, and was thrown down, cursed, and threatened, in presence of crowd, *held* not so excessive as clearly to indicate a punitive purpose, or primarily to entail a penal consequence.

7. DAMAGES—COMPENSATORY DAMAGES FOR INJURIES TO FEELINGS REST IN SOUND DISCRETION OF JURY CONTROLLED BY DISCRETIONARY POWER OF JUDGE.—Allowance of compensatory damages for injuries to feelings, humiliation, and mental suffering must rest in the sound discretion of the jury controlled by the discretionary power of the Circuit Judge.

8. TRIAL—CHARGE SUBMITTING QUESTION OF DAMAGES FOR HUMILIATION HELD NOT CHARGE ON FACTS.—In passenger's action for refusal of gatekeeper to permit him to pass through gate to train, charge submitting question. of damages for humiliation *held* not a charge upon the facts as assuming that passenger's feelings had been wounded.

9. DAMAGES—DOCTRINE OF CONTRIBUTORY NEGLIGENCE OR WILLFULNESS HELD APPLICABLE RATHER THAN DOCTRINE OF MITIGATION OR REDUCTION OF DAMAGES.—In passenger's action for humiliation suffered on gatekeeper's refusal to permit him to pass through gate to train, in which evidence showed that passenger tried and was refused passage through gateway a number of times, doctrine of mitigation or reduction of damages was not applicable; the doctrine applicable in such case being that of contributory negligence or wilfulness.

10. DAMAGES—PRINCIPLE AS TO MITIGATION OF DAMAGES ENTITLES DEFENDANT TO ELIMINATION OF ONLY SUCH DAMAGE AS COULD HAVE BEEN AVOIDED BY PROPER CARE.—The principle as to mitigation of damages entitles the defendant merely to elimination from consid-

-eration of jury of such damages as could have been avoided by injured party in exercise of proper care.

11. APPEAL AND ERROR—SUPREME COURT MAY AFFIRM WHERE DAMAGES IMPROPERLY ALLOWED CAN BE SEGREGATED.—Where portion of damages improperly allowed is sharply segregated by the evidence, and may be definitely computed upon a mathematical basis, the Supreme Court need not grant a new trial, but in the exercise of discretion may affirm on condition that plaintiff remits such damages.

Before MAULDIN, J., Sumter, November, 1921. Affirmed, subject to entry of remission, otherwise, reversed.

Action by J. M. Currie against James C. Davis, Agent. Judgment for plaintiff and defendant appeals.

*Messrs. Douglas McKay* and *Reynolds & Reynolds,* for appellant, cite: *Measure of damages—evidence:* 81 S. C., 181. *Profits—uncertain and speculative:* 76 S. C., 345; 65 S. C., 490. *Mitigation of damages:* 102 S. C., 130; 106 S. C., 133; 82 S. C., 468. *Train sheets as evidence:* 50 S. E., 452; 105 Am. St. Rep., 171; 99 Am. St. Rep., 710; 84 S. E., 262; 103 S. E., 783; 86 S. C., 91; 103 S. E., 783. *Punitive damages against sovereign powers:* Sec. 10, Fed. Control Act, 272 Fed. Rep., 230; 228 S. W., 667; 65 L. Ed., 1087.

*Messrs. L. D. Jennings* and *M. M. Weinberg,* for respondent, cite: *Damages arising out of tort:* 25 S. C., 69. *Profits:* 63 S. C., 148; 7 A. L. R., 653; 53 L. R. A., 588; 77 S. C., 183. *Damages against carrier under Federal Control:* U. S. Sup. Ct. Adv. Op., 1920-21, No. 16, page 648. *Humiliation as actual damages:* 108 S. C., 155; 30 L. Ed., 1049; 58 L. R. A., 397; 81 A. S. R., 528; 231 L. R. A. 1918-B, 273; 60 L. R. A., 403; 22 A. S. R., 490; 88 Ind., 381; 11 Nev., 350; 46 Tex., 272; 7 A. S. R., 535; 36 L. Ed., 71; 40 L. R. A., 995; 102 A. S. R., 105; 53 So., 671; 36 N. Y. Sup., 949; 33 L. R. A. (N. S.), 386; 46 L. R. A., 549; 43 Me., 162; 60 N. H., 27; 137 Mass., 136; 60 Tex., 45; 18 W. Va., 1; 23 Ohio St., 10; 112 Ill., 295; 36 Wisc., 657; 10 C. J., 894; 17 C. J., 184; Note 7

A. S. R., 535. *Refusal to grant new trial for excessive damages not subject to review:* 100 S. C., 33; 98 S. C., 62; 29 S. C., 303; 11 S. C., 589.

February 26, 1923.

The opinion of the Court was delivered by MR. JUSTICE MARION.

On August 31, 1919, at Florence, S. C., the plaintiff purchased a ticket entitling him to transportation as a passenger on a line of railroad then in charge of the Director General of Railroads of the United States Government, from Florence, S. C., to Mayesville, S. C. He then presented himself at the gate through which passengers were required or invited to pass in order to board trains. The gate was in charge of a gatekeeper, a railroad employee, to whom the plaintiff showed his ticket. The gatekeeper refused him passage through the gateway, and then "shoved" him back, causing him to fall and bruise his arm, in the presence of a "crowd of people." Thereafter the plaintiff made four attempts, at separate times, to get through the gate to his train. Each time he was threatened with physical violence and cursed by the gatekeeper. He then went to the ticket agent, told him of important business plans and arrangements that made it necessary for him to get to Mayesville on the train for which he had bought his ticket. The ticket agent suggested that he try getting through another gate about 75 feet away, but which, as plaintiff claimed, "was not for passengers to go through." He told the ticket agent he did not care to steal through, as he had bought his ticket. He then met Captain Johnson, a conductor for the line of railroad upon which he had taken passage, who, upon being apprised of the situation, advised him to try the gateman again. He then went back to the gate, again showed the gateman his ticket, and was again repulsed with rude, threatening, and insulting language. After that he made one or two more attempts to get through

the gate, with the same result. The remarkable story, out-
lined by the foregoing statement, is the more remarkable in
that it is corroborated rather than discredited in essential
particulars by the testimony of Conductor Johnson and the
ticket agent, defendant's witnesses at the trial. In an ac-
tion for damages the plaintiff recovered a verdict for $10,-
000.00. From judgment thereon, the defendant appeals.

Plaintiff claimed that on account of missing his train
in Florence he was prevented from getting certain
gin machinery installed and erected in due course,
as a result of which he was delayed four days in starting
two ginneries, one at Mayesville and the other at Eutaw-
ville, and that such delay caused him to sustain a certain
pecuniary loss which he was entitled to recover as an ele-
ment of the damages proximately caused by defendant's
misconduct. The defendant's first exception imputes error
to the trial Judge in permitting the plaintiff to testify over
objection "what his average gross earnings were per day
after his ginneries at Mayesville and Eutawville began to
operate." The contention is that the testimony was "purely
speculative and incompetent, being no measure by which
damages could be ascertained for a few days delay in the
institution of said ginneries, and before they were estab-
lished as going concerns." The exception on this point must
be sustained. It is not entirely clear from the evidence
printed in the record whether the ginneries in question could
be classified as established plants, in the sense that they
were old gin stands in which new machinery, in whole or
in part, was to be installed for the current ginning season,
or whether they were essentially new plants which were in
process of establishment for the inauguration of what was
for the plaintiff a new business enterprise. If the ginneries
were of the character of established industrial or manufac-
turing plants, then the measure of damages for an interrup-
tion in operation, or for delay in starting operations for the
cotton season, was the rental value, to be determined in ac-

cordance with the rule laid down by this Court in the case of *Standard Supply Co. v. Carter & Harris,* 81 S. C., 181, 187; 62 S. E., 150; 19 L. R. A. (N. S.), 155, in which case the precise question was elaborately considered and clearly decided. In the case at bâr there was apparently no attempt to apply the measure of rental value. In any event, the data supplied by the evidence affords no adequate basis of fact for applying such measure. Hence, since the evidence is susceptible of the inference, which is assumed as a fact by defendant's exception, that the ginneries were not established plants or going concerns, but were, at the time of the alleged delay, new business enterprises, not yet in active operation, the admissibility of the testimony as to subsequent gross earnings must be determined in accordance with that theory of the facts. In such case the correct measure of damages is thus stated by Mr. Justice Woods, who delivered the opinion of the Court, in *McMeekin v. Southern Railway,* 82 S. C., 468, 473; 64 S. E., 413, 415:

"The plaintiff's business had not been launched, and, therefore, he could not recover profits he expected to make. *Tappan & Noble v. Harwood,* 2 Speer, 536. *Bird v. Tel. Co.,* 76 S. C., 345; 56 S. E., 973. *Standard Supply Co. v. Carter & Harris,* 81 S. C., 181. The mill was not erected, and it was impossible to anticipate the conditions which would exist at the time of completion. Indeed, it might be that the mill would never be completed. For these reasons there would be no reasonably certain basis upon which to compute the measure of damages for rental value, as in the case of the stoppage of a completed ginning plant like that in *Standard Supply Co. v. Carter & Harris, supra.* The true measure of damages, therefore, in this case, is the loss to the business of constructing a mill—not running a mill. The loss to the business of construction was the interest on the money invested in the work of construction, and the wages of the laborers employed for construction, reduced by the earnings which the plaintiff either received or by rea-

sonable diligence could have received from the employment of such laborers in other work. *Saluda Mfg. Co. v. Pennington,* 2 Speer, 746."

No adequate consideration, founded upon the evidence, is suggested for not applying that measure of damages to the case at bar. Gross earnings or profits per day after the ginneries started, certainly in the absence of other material facts and circumstances, could afford no reliable or reasonably fair test by which to estimate loss of net profits from a delay of four days in starting the gins. Aside from the fact that profiits cannot be ascertained from gross earnings alone, every bale of cotton available for ginning during the four days preceding the opening of the ginneries might actually have been ginned by the plaintiff at the same profit after his gins started. There is no evidence as to local or special conditions tending to establish that as a result of the delay in opening any business was actually diverted to other plants, or that plaintiff's output as a whole for the season was in any wise diminished. The amount of the verdict warrants the inference that the jury accepted the only measure of damages tendered them in that aspect of the case, which was plaintiff's estimate of his loss at $160.00 in gross profits per day for one plant, and $175.00 per day for the other, or a total loss of $1,340.00 for the delay of four days in starting the two ginneries. As the testimony objected to furnished a basis for the application of that improper measure of damages, its admission was prejudicially erroneous.

The plaintiff's claim that he was delayed four days 2-4 in starting his ginneries was based primarily upon the assumption of fact that, if he had reached Mayesville Sunday night on the train he was prevented from boarding, he could have obtained certain papers and checks which would have enabled him to proceed to Eutawville the following morning and take up the bill of lading and secure delivery from the railroad carrier of his gin machinery

which was there awaiting him. The defendant offered the train dispatcher and the train sheets kept by him to prove that the train in question which was due to arrive at Mayesville about 8:00 p. m., did not reach there until after midnight, too late for the plaintiff to have transacted his business. This evidence was excluded upon the ground that it violated the hearsay rule. Defendant's second exception imputes error to the trial Judge in so ruling. The witness, Bellinger, was the official train dispatcher; the train sheets were the original records made by him in the discharge of his official duty in the ordinary course of business, based upon telegraphic reports transmitted to him from the various stations by agents whose duty it was personally to observe the facts and transmit the reports as to the time of arrival and departure of trains. The point raised has not been expressly decided in this State, and is one as to which there is a conflict of authority in other jurisdictions. We think the evidence was admissible. The fundamental reasons upon which the numerous well established exceptions to the hearsay rule are based are "circumstantial guaranty of trustworthiness and necessity." 2 Wigmore on Evidence, § 1420; 1 Elliott on Evidence, § 320.

Applying first the test of trustworthiness, we know of no class of records made in "the regular course of duties or business" which are more convincingly verified by the circumstances under which they are made, and the character of the entries themselves. It is a matter of common knowledge that the train dispatcher of a railroad is the field officer upon whose orders depend the movement of all trains upon a line, a division, or a system. In a figurative but apposite sense it may be said that, by day and by night, the train dispatcher rides as the superpilot upon every locomotive that pulls freight and passengers through cut and tunnel, over fill and bridge, from station to station, between distant termini. Grave public interests, dependent upon the prompt carriage of mails and the uninterrupted flow of

commerce, the safety of property, and the lives of crews and passengers are staked upon the correctness and reliability of a train dispatcher's orders. These orders are based upon the information secured by personal observers transmitted by telegraph or telephone, entered upon the train sheets, and thereafter relied upon by the train dispatcher as "chart and compass" in guiding and controlling the movement of distant trains. In this connection the language of the Massachusetts Court in the case of *Donovan v. Boston, Etc., R. R. Co.,* 158 Mass., 450; 33 N. E., 583, is pertinent:

"It is clear that the sheet was worse than useless, if its statements, as seen by the dispatcher, were not accurate. Every interest of the defendant demanded that an entry when made should be true, and no reason can be conceived why the defendant should procure or permit a false or incorrect entry to be placed under the eye of the official who controlled the movement of its trains; nor is there any reason to presume that the operator who observed the passing of the trains at a station, and telegraphed the information to the dispatcher's office, or to the person who there received the messages and made the entries on the sheet, had any interest to mistake the facts or to make false entries. The system was the established course of the defendant's business, so that the sheet was not an accidental memorandum, and every step by which the information spread upon it was gathered, transmitted, and entered, was an act performed by some person in the line of his duty and in the usual course of his employment, under a sanction tending to make his statements true, and these acts were so connected with and dependent upon each other as to form parts of one transaction."

In discussing the admissibility of entries of this general character, Professor Wigmore says:

"When it is a mere question of whether provisional confidence can be placed in a certain class of statements, there cannot profitably and sensibly be one rule for the business

world and another for the Courtroom." Wigmore on Ev., § 1530.

We think the entries upon a dispatcher's train sheets, recognized and relied upon as safe in the operation of a great and complicated business, very fully meet the test of the "circumstantial guaranty of trustworthiness." Likewise, we are of the opinion that such entries satisfactorily meet the test of necessity. As is said by Mr. Justice Connor in an elaborate and well considered opinion upon this precise question in the case of *Fireman's Insurance Co. v. Seaboard Air Line Railway*, 138 N. C., 42, 52; 50 S. E., 452; 107 Am. St. Rep., 517:

"Prof. Wigmore suggests that when an entry is made in the usual course of business, based upon reports made by one whose duty it is to make such report, but who is not required to make and keep any record of the transaction, the entry so made is admissible upon the ground of necessity growing out of the fact that it is not to be expected that the person making such report would remember the fact reported, and that he is, therefore, unavailable in a legal sense. It is not to be expected that an operator, who reports to the dispatcher the time of arrival and departure of a number of trains daily, could undertake to testify from memory the hour and minute of each arrival or departure. He has no duty imposed upon him to do so. If he did undertake to testify, as in this case, three years after the event, but little credence would be attached to his testimony. For practical purposes, he is as essentially unavailable as if dead or insane."

In the case at bar the trial was had more than two years after the date upon which the particular train in question arrived at Mayesville. The practical necessity for the admission of the train sheets, grounded upon the considerations above suggested, is apparent. As the evidence offered was more or less relevant to a material issue of fact, its exclusion was prejudicially erroneous, and the appellant's

second exception must be sustained. See generally, *Seaboard Air Line Railway Co. v. Earle,* 86 S. C., 91; 67 S. E., 1069; 138 Am. St. Rep., 1028. *J. L. Mott Iron Works v. Kaiser* (S. C.), 103 S. E., 783. *State v. Stephenson,* 69 Kan., 498; 77 P., 277; 66 L. R. A., 261; 105 Am. St. Rep., 171; 2 Ann. Cas., 873. *Scott v. Astoria R. R. Co.,* 43 Or., 26; 72 P., 594; 62 L. R. A., 543; 99 Am. St. Rep., 710. *Ferebee v. Berry,* 168 N. C., 281; 84 S. E., 262. *Erk v. Simpson,* 137 Ga., 608; 73 S. E., 1065.

The appellant's third point (Exceptions 3, 4, and 6) is directed to the contention that the trial Court erred in holding that the plaintiff was entitled to recover damages for humiliation in the action at bar against the sovereign power. It is conceded that under the Federal Control Act (U. S. Comp. St. 1918 [U. S. Comp. St. Ann. Supp. 1919, §§ 3115¾a–3115¾p]), and under the orders issued pursuant thereto by competent executive authority, all damages which may be properly classified as actual or compensatory are recoverable in an action against the Director General or other duly authorized agent of the government. But it is argued that the damages recovered in this action for alleged injury to feelings or for humiliation caused by the wrongful conduct of defendant's gateman were "nothing more nor less than an award of punitive damages" under the guise of compensation. That contention is rested primarily on the construction of the Federal law adopted by the Supreme Court of the United States in *Missouri Pacific R. Co. v. Ault,* 256 U. S., 554; 41 S. Ct., 593; 65 L. Ed., 1087, 1092, and clearly expressed as follows:

"Wherever the law permitted compensatory damages, they may be collected against the carrier while under Federal Control. * * * But double damages, penalties, and forfeitures, which do not merely compensate but punish, are not within the purview of the statute."

There can be no doubt that under the settled law of this jurisdiction, prior to the passage of the Federal Control Act,

such breach of the carrier's duty to a passenger as proximately caused the infliction of injury to feelings, mental suffering, or humiliation, even in the absence of physical injury, afforded an adequate legal foundation for the award of actual or compensatory damages. *Lipman v. A. C. L. R. Co.,* 108 S. C., 151; 93 S. E., 714; L. R. A. 1918A, 596. *Cave v. Railway Co.,* 94 S. C., 282; 77 S. E., 1017; L. R. A. 1915B, 915; Ann. Cas. 1915A, 1065. *Adams v. Railway,* 103 S. C., 327; 87 S. E., 1007; L. R. A. 1916D, 1183. That view, as pointed out by Mr. Justice Hydrick in *Lipman v. R. Co., supra,* is in accord with the overwhelming weight of reason and authority. In the case of *Gillespie v. B. H. R. Co.,* 178 N. Y., 347; 70 N. E., 857; 66 L. R. A., 618; 102 Am. St. Rep., 503, the New York Court considers the question, and very fully reviews the authorities, as to whether damages for humiliation suffered because of such breach of the carrier's duty are properly recoverable as compensatory damages, and arrives at a conclusion in accord with the following statement of the law quoted from Thompson on Negligence, § 3288:

"Damages given on the footing of humiliation, mortification, mental suffering, etc., are compensatory, and not exemplary damages. They are given because of the suffering to which the passenger has been wrongfully subjected by the carrier. The *quantum* of this suffering may not and generally does not depend at all upon the mental condition of the carrier's servant, whether he acted honestly or dishonestly, with or without malice."

See Joyce on Damages, § 354; 4 R. C. L., 1174, 1175. In the case at bar there was evidence tending to establish a breach of the contract of carriage by tortious conduct, subjecting a passenger to the indignity of assault and battery, insult, and contumely. For the injury to his feelings, humiliation, and mental suffering thus inflicted upon the plaintiff by the servants of a carrier under the control of the Director General of Railroads, we are clearly of the opinion

that compensatory damages were recoverable. The case at bar was properly tried upon that theory in the Court below, and, while the amount of the verdict is unquestionably large, we are not prepared to hold that the award is so excessive as clearly to indicate a punitive purpose or primarily to entail a penal consequence. The assessment of unliquidated damages for an injury of this character cannot proceed by rule and must rest in the sound discretion of the jury, controlled by the discretionary power of the Circuit Judge, in the tribunal appointed by law to try the facts. There is no market value for injured feelings. The value of money in comparison with the value of the normally self-satisfied state of mind of which a man may be deprived by a wrongful invasion of his rights, a trampling upon the sensitive tentacles of his personal dignity, a public aspersion upon his manhood, or by abusive treatment of any character, is a matter as to which reasonable men may, and do, differ widely. The verdict was approved by the Circuit Judge as an award of compensatory damages. His conclusion cannot be held erroneous as a matter of law. See, generally, *Bing v. R. Co.,* 86 S. C., 530; 68 S. E., 645. *Huggins v. Railroad Co.,* 96 S. C., 267; 79 S. E., 406. *Yarborough v. Electric Co.,* 100 S. C., 33; 84 S. E., 308. *Southerland v. Davis,* 122 S. C., 511; 115 S. E., 768. *Southern Ry. v. Bennett,* 233 U. S., 81; 34 S. Ct., 566; 58 L. Ed., 860.

In submitting the case upon the theory that actual damages for humiliation were recoverable the Circuit Judge approved as "good law" a request to charge, read by plaintiff's counsel, to the effect that "wounding a man's feelings is as much actual damage as breaking his limbs"; that "the difference is that one is internal and the other external, the one mental, the other physical"; that "in either case the damage is not measurable with exactness," but, since a closer approximation could be made in estimating damage to a limb, "the jury would have a wider discretion in dealing with feelings than with an external

injury," etc. The only objections to that instruction urged by appellant are (1) that the "plaintiff was not entitled to recover against the United States administration for humiliation"; and (2) that "said charge was upon the facts and contrary to the Constitution of South Carolina." While the charge as framed may be open to criticism we do not think the objections suggested are valid. The first has already been disposed of. As to the second, we see no ground for appellant's contention that the Court charged as a fact that the plaintiff's feelings had been wounded, and directed that the jury award the same amount of damages as if the plaintiff's body had been mutilated. Further, the record discloses that, while the trial Judge approved the request as a proposition of law, he followed that comment by very clear directions to the jury that they "must look to the evidence to see whether that allegation of the complaint (as to humiliation) is established here," etc., and, "if it is true, then that would be the basis for a recovery of such actual damages" as they might "think the evidence in the case would warrant" them in awarding, etc. Certainly, as thus safeguarded, the instruction may not properly be condemned as a charge on the facts in violation of the constitutional inhibition in that regard. See *State v. Hays,* 121 S. C., 163; 113 S. E., 362.

The defendant requested the trial Court to charge 9, 10 "that it is the duty of a passenger, who has, through mistake or misapprehension on the part of the agent of the defendant, been prevented from taking his train, on which he held a ticket to use all means known to him, or suggested by any agent of the defendant to minimize his damages." Error is assigned (Exception 5), in that the Circuit Judge responded to the request as follows:

"That is correct, Mr. Foreman and gentlemen, and you apply it with reference to that element of this case wherein plaintiff is seeking to recover damages by reason of loss to his property."

Appellant contends that under the facts of this case the law imposed upon the plaintiff the duty to minimize his damages, in so far as they were due to humiliation resulting from the gatekeeper's first rejection, by not thereafter subjecting himself to affront by repeatedly approaching the Cerberus at the gate, or by accepting the ticket agent's kindly suggestion that he try a flanking movement. We think the law applicable in that aspect of the case was the rule of contributory negligence or willfulness rather than the principle as to mitigation or reduction of damages. But, if the latter principle were applicable, the avoidable consequential damages which the defendant was entitled to have eliminated from the consideration of the jury were only such as could have been avoided by the injured party in the exercise of proper care. 17 C. J., p. 926, § 224. In any view, the requested instruction was faulty in imposing the duty to use all known or suggested means to minimize damages irrespective of the applicable standard of reasonableness or due care, and appellant is not in position to complain of the modification as prejudicial error.

From the foregoing consideration of appellant's points it appears that the only reversible errors of law disclosed by the record relate wholly to the measure and assessment of the pecuniary damages alleged to have been sustained by the plaintiff from the delay in starting his ginneries caused by his failure to reach Mayesville on the train he was prevented from boarding. If the extent to which those errors affected the verdict were indeterminate, the defendant would unquestionably be entitled to a new trial generally. But the portion of the whole damages attributable to the plaintiff's alleged business loss is sharply segregated by the evidence, and may be definitely computed upon a mathematical basis. According to the plaintiff's own testimony, the only evidence adduced, his business loss could not have exceeded the sum of $1,340.00, the aggregate of the estimated profits from four days' operation of his

ginneries.   In that state of the record the disposition of the appeal presents a question essentially similar to that involved in an appeal from judgment upon a verdict separately assessing actual and punitive damages or specially finding definite amounts for distinct items of a claim.   In such case it is within the discretionary power of this Court to affirm or reverse in part or upon conditions that will effectually serve to correct the errors of law disclosed.   4 C. J., p. 1137, §§ 3135, 3148.   *Gray & Shealy v. Railway Co.,* 81 S. C., 370; 62 S. E., 442.   *Riley v. Railway,* 81 S. C., 387; 62 S. E., 509.   *Blowers v. Railway,* 74 S. C., 221, 231; 54 S. E., 368.   *Vance v. Ferguson,* 101 S. C., 125, 134; 85 S. E., 241.   *Ellison v. Railway Co.,* 94 S. C., 425, 433; 77 S. E., 723; 78 S. E., 231.   *Calhoun v. Southern Railway Co.,* 115 S. C., 489; 106 S. E., 780.   *Massey v. Hines,* 117 S. C., 1; 108 S. E., 180.   *Hansen v. Boyd,* 161 U. S., 397; 16 S. Ct., 571; 40 L. Ed., 746.   There can be no doubt that a remission in full by the appellee of such portion of the verdict as could have been affected by the erroneous rulings of the trial Judge would correct or cure the errors involved in the judgment here appealed from.   Since it is in the public interest, as well as to the interest of parties to actions, that litigation should be shortened, and that appeals should not delay the accomplishment of substantial justice, we are of the opinion that the appropriate judgment upon this appeal is the award of a new trial *nisi.*

It is accordingly ordered that the judgment of the Circuit Court be reversed and a new trial granted, unless the plaintiff shall within ten days after the filing of the remittitur in the Circuit Court remit on the judgment record, as of the date of the verdict, the sum of $1,340.00, and that upon the entry of such remission the judgment of the Circuit Court stand affirmed.

Reversed, *nisi.*

MR. CHIEF JUSTICE GARY and MESSRS. JUSTICES WATTS and FRASER concur.

MR. JUSTICE COTHRAN did not participate.